UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JAMIE M. SHAW, et al.**,                         Case No. 3:11 CV 564

           Plaintiff,                         Magistrate Judge James R. Knepp, II

      v.                                         MEMORANDUM OPINION AND ORDER

**ECONOMIC OPPORTUNITY PLANNING
ASSOCIATION OF GREATER TOLEDO,
INC., et al.**

           Defendant.

## INTRODUCTION

Plaintiff Jamie M. Shaw was employed by Defendant Economic Opportunity Planning Association of Greater Toledo, Inc. (EOPA) as a disabilities assistant beginning January 5, 2009. Among state tort law claims, Plaintiff alleges Defendant EOPA discriminated against her based on pregnancy and gender. Plaintiff further alleges Defendant Ohio Association of Public School Employees (OAPSE) breached its duty to fairly represent her and EOPA breached its obligations under a collective bargaining agreement (CBA) between OAPSE and EOPA. Additionally, Plaintiff's husband asserts a claim for damages due to loss of consortium. (Doc. 15, at 11).

The Court has jurisdiction under 28 U.S.C. § § 1331 and 1367. The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). Plaintiff alleges nine causes of action:

1.      Breach of CBA under the Labor Management Relations Act (LMRA);

2.      Breach of Duty of Fair Representation;

3.      A hybrid § 301 claim under the LMRA;

4.      Intentional Tort, Malice, and Bad Faith;

5.      Interference with Family Medical Leave Act (FMLA);

6.      Gender and Pregnancy Discrimination in Violation of Title VI of the Civil Rights
         Act  and Ohio Public Policy;

7.      Gender Discrimination;

8.      Public Policy Tort for Gender Discrimination; and

9.      Intentional Infliction of Emotional Distress and Loss of Consortium.

(Doc. 15).

Defendant EOPA filed a Motion for Summary Judgment on all counts. (Doc. 20). Plaintiff

filed a Response (Doc. 23), and Defendant filed a Reply (Doc. 25). For the reasons explained below,

the Court grants Defendant's Motion for Summary Judgment.

## BACKGROUND

On January 5, 2009, Plaintiff began working for EOPA as a disabilities assistant, teaching

children with learning disabilities and assisting teachers in a classroom setting. (Doc. 15, at 3; Doc.

20, at 3; Doc. 19-1, at 9). Plaintiff's employment contract was pursuant to a CBA between EOPA

and its employee union OAPSE. (Doc. 15, at 3).

Plaintiff's employment with EOPA, while brief, was turbulent. The event giving rise to the

instant action was her termination January 29, 2010. Prior to that, however, Plaintiff was terminated

May 16, 2009, though subsequently reinstated. The facts relating to the May 16, 2009 termination

are not dispositive here, but provide necessary background and context.

On or about May 4, 2009, Plaintiff alleges her direct supervisor Linda Anderson reprimanded

her for suggesting a job opening be posted through OAPSE, ostensibly to protect herself from being

replaced by an applicant with more seniority. (Doc. 15, at 3). Shortly after, Plaintiff was called into Ms. Anderson's office for a "counseling session" based on her probationary status as a new employee and was terminated. (Doc. 15, at 3). Ms. Anderson testified Plaintiff was terminated for being disrespectful to other employees. (Doc. 19-1, at 24-18). However, Plaintiff believed she was terminated for engaging in protected union activity. (Doc. 15, at 3). Plaintiff sought the assistance of OAPSE to challenge her termination. (Doc. 15, at 4). In turn, OAPSE filed a charge with the National Labor Relations Board (NLRB) challenging Plaintiff's termination. (Doc. 15, at 4). On September 15, 2009, Plaintiff was reinstated to her position as a disabilities assistant pursuant to a settlement agreement between EOPA and OAPSE. (Doc. 15, at 4).

Plaintiff returned to work at EOPA on September 21, 2009, met with human resources to complete paperwork, then went to her first assignment of the day.  (Doc. 15, at 4; Doc. 19-3, at 52). After lunch, Plaintiff met with Ms. Anderson and informed her she was pregnant. (Doc. 19-3, at 53). Plaintiff claims Ms. Anderson "reprimanded" her for being pregnant – specifically, that Ms. Anderson indicated another employee was also pregnant and was concerned it would be unfair for other staff members to have to cover for two maternity leaves. (Doc. 19-3, at 53). Ms. Anderson denies making this statement. (Doc. 19-1, at 35). After the meeting, Plaintiff went to her next assignment. (Doc. 19-3, at 53). Later that afternoon, Plaintiff began having contractions and called Ms. Anderson to inform her she needed to leave to see her doctor.  (Doc. 19-3, at 54). Plaintiff's physician placed her on bed rest and told her she could not return to work until after the baby was born. (Doc. 19-3, at 54). Plaintiff's estimated return to work date at that time was February 4, 2010. (Doc. 15, at 4; Doc. 19-3, at 57).

Plaintiff immediately contacted EOPA human resources technician Rolanda Key to inform

3

her about her condition and request the necessary paperwork for medical leave. (Doc. 19-3, at 55-56). Ms. Key testified that she told Plaintiff she did not qualify for extended leave under the FMLA during this conversation – something Plaintiff was aware of. Rather, Ms. Key informed Plaintiff she qualified for serious medical illness leave, which allowed her " two [30] day leaves"  pursuant to EOPA's serious medical leave policy. (Doc. 19-3, at 60; Doc. 19-2, at 13). Plaintiff refers to this policy as "leave without pay". (Doc. 19-3, at 63). Ms. Key testified she informed Plaintiff if she needed more than 60 days, Plaintiff would have to speak with the human resources director for approval. (Doc. 19-2, at 13). Ms. Key testified she mailed Plaintiff a letter confirming her 60 day serious medical leave, indicating it would expire on November 21, 2009. (Doc. 19-2, at 22). Plaintiff denies Ms. Key told her she was only entitled to 60 days of leave and denies receiving a letter; rather, Plaintiff assumed she was covered by the "leave without pay" policy until her return date of February 4, 2010. (Doc. 19-2, at 68-70).

Although Plaintiff's due date was in January 2010, she delivered several weeks early, on December 10, 2009. (Doc. 19-3, at 68). Even so, she still anticipated her return to work date was February 4, 2010.  (Doc. 19-3, at 69). After her son was born, Plaintiff tried to contact EOPA human resources to confirm her back to work date and could not reach anyone, but testified she left a phone message indicating she would be back February 4, 2010. (Doc. 19-3, at 69).

Plaintiff claims she first learned of the 60 day serious medical illness leave policy in a letter she received January 13, 2010. (Doc. 19-2, at 70). After receiving the letter, she called EOPA human resources to discuss the policy and was informed a pre-disciplinary hearing was scheduled regarding her exhausted leave January 25, 2010. (Doc. 19-2, at 68-70). At the pre-disciplinary hearing, EOPA human resources personnel notified Plaintiff she was subject to termination for exhausting her leave

4

past the 60 days. (Doc. 19-3, at 75-77). Ms. Anderson was not a part of the meeting. (Doc. 19-3, at 75). On January 29, 2010, Plaintiff was asked to attend an additional meeting with human resources director Jack Hackett to answer follow-up questions. (Doc. 19-3, at 77). Again, Ms. Anderson was not present. (Doc. 19-3, at 76). At the end of this meeting, Mr. Hackett told Plaintiff he would contact her once a decision was made regarding her termination. (Doc. 19-3, at 77).

Since Plaintiff had not heard anything, she returned to work February 4, 2010. (Doc. 19-3, at 78). Upon arrival, Mr. Hackett informed Plaintiff she had been terminated as of January 29, 2010 for failing to return to work after exhausting medical leave. (Doc. 19-3, at 78). The following day, Plaintiff received a letter from EOPA indicating she had been terminated. (Doc. 19-3, at 78).

Subsequently, Plaintiff contacted OAPSE and filed a grievance regarding her termination. (Doc. 19-3, at 79). A grievance hearing was held and attended by EOPA's executive director Dr. Scott, EOPA human resources personnel, Plaintiff, and an OAPSE representative. (Doc. 19-3, at 81). Shortly after the hearing, Dr. Scott sent a letter to Plaintiff concurring with the decision to terminate her employment. (Doc. 19-3, at 81-83). Plaintiff sought further recourse, requesting arbitration through the OAPSE appeal process. (Doc. 19-3, at 86). Ultimately, OAPSE chose not to pursue Plaintiff's claim through arbitration. (Doc. 19-3, at 93). Thus, Plaintiff initiated the instant action against EOPA and OAPSE.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v.*

5

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### ANALYSIS

#### *§ 301 Hybrid Claim*

A hybrid § 301/fair representation claim arises when a plaintiff alleges her employer breached its obligations under a CBA in violation of § 301 of the LMRA, and the plaintiff's labor union violated its duty of fair representation. *See Delcostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169 (1983); 29 U.S.C. § 185. These two claims are "inextricably interdependent", and require courts to analyze them as one hybrid § 301 claim. *Delcostello*, 462 U.S. at 164-65. Here, Plaintiff alleges EOPA breached the CBA and OAPSE breached its duty of fair representation. (Doc. 15, at 5-7). Therefore, the Court analyzes Counts One, Two, and Three in Plaintiff's Amended Complaint as one claim pursuant to *Delcostello* and its progeny.

The statute of limitations for filing a hybrid § 301 claim is six months. *Delcostello*, 462 U.S. at 169. Such a claim accrues when an employee discovers, or should have discovered with exercise of due diligence, acts giving rise to the cause of action, even if some possibility of nonjudicial enforcement remained. *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 83 F.3d 747, 757 (6th Cir. 1996); *see Bippus v. Local 100 of Int'l Bhd. of Teamsters*, 1984 WL 2315, at *3 (S.D. Ohio 1984). A hybrid claim "accrues against a company defendant at the same

6

time it accrues against a union defendant, since the predicate for the entire action is that the union breached its duty of fair representation." *Bloedow v. CSX Transp., Inc*. 319 F.Supp.2d 782, 787 (6th Cir. 2004). A prospective § 301 hybrid claimant need not have official notification of a union's possible breach in order for rights to accrue for statute of limitations purposes. *Id*. at 788-89. Rather, prolonged or unreasonable delay by the union is enough to put a person on notice of the existence of her claim. *Id*. at 789 (quotations omitted). For instance, when affirming the dismissal of a hybrid claim as untimely, the Sixth Circuit opined, "In light of plaintiff's testimony that he felt the [u]nion was giving him the 'run-around' the [u]nion's inactivity after the . . . letter should have put him on notice of his claim against the [u]nion." *Yates v. Memphis Bakery Emp'rs Ass'n*, 907 F.2d 151, 1990 WL 94211, at *2 (6th Cir. 1990). Importantly, the determination of the accrual date is an objective one, meaning "the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to objective facts concerning the accrual of their right to sue." *Gately v. Textron, Inc.*, 125 F.3d 855, at *2 (M.D. Tenn. 1997) (quoting *Noble v. Chrystler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir. 1994)).

Plaintiff filed a grievance through OAPSE immediately after her termination and a hearing was held sometime between February 4 and February 24, 2010. (Doc. 19-3, at 79-80). After the hearing, EOPA's executive director sent a letter to Plaintiff stating he agreed with the decision to terminate her. (Doc. 19-3, at 80). On March 4, 2010, Plaintiff elected to appeal this decision and pursue arbitration. (Doc. 19-3, at 83-84). Pursuant to the advice of her OAPSE representative, Plaintiff immediately began calling the union to move her case along because "it could take a year until arbitration was resolved." (Doc. 19-3, at 84-85). However, despite repeated attempts at contact, Plaintiff never received a call back from the union regarding arbitration. (Doc. 19-3, at 84-87).

Indeed, Plaintiff had no contact with OAPSE regarding arbitration until after she filed the instant case. (Doc. 19-3, at 84-87).

Plaintiff argues she was never told the claim was not going to arbitration; instead, she was told the union was waiting for a list of arbitrators. However, the standard, as noted above, is not whether a nonjudicial possibility remained; rather, it is when an employee discovers, or should have discovered with exercise of due diligence, acts giving rise to the cause of action, such as prolonged delay or inaction. Plaintiff's contact with the union ceased after she filed her arbitration request on March 4, 2010. (Doc. 19-3, at 86-87). Therefore, Plaintiff was aware, or should have been aware, of the union's inaction at that time based on her repeated attempts to reach union representatives to no avail. However, Plaintiff filed the instant action twelve months later, roughly six months after the statute of limitations. Accordingly, Plaintiff's § 301 hybrid claim is time-barred.[1]

***FMLA claims***

To be covered under the FMLA, a plaintiff must be an "eligible employee". *Hodge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004). An "eligible employee" is one who has been employed "for at least twelve months", and has performed "at least 1,250 hours of service" during the twelve month period. 29 U.S.C. § 2611(A). Plaintiff asserts two FMLA claims: interference under 29 U.S.C. § 2615(a)(1) and retaliation under 29 U.S.C. § 2615(a)(2). (Doc. 15, at 8-9; Doc.

---

1. While not mentioned by either party, Plaintiff alleges a separate count titled "Intention Tort, Malice, and Bad Faith" against OAPSE in her Amended Complaint. Tort claims based on union duty of fair representation claims are pre-empted under the NLRA. *San Diego Bldg. Trades v. Garmon*, 359 U.S. 236 (1959). Therefore, the Court expects this claim – bad faith – was asserted to establish breach of fair representation as part of the § 301 hybrid claim. *Amalgamated Ass'n of St. Elec. Ry. And Motor Coach Emp. of America v. Lockridge*, 403 U.S. 274 (1971) (To prevail on the merits of the fair representation portion in the § 301 hybrid claim, an employee must prove arbitrary, discriminatory, or bad faith conduct or inaction on the union's part, and there must be substantial evidence of fraud, deceitful inaction, or dishonest conduct.).

8

22, at 8-10). Plaintiff suggests incorrectly that the retaliation provision does not require her to be an "eligible employee". Plaintiff must be an "eligible employee" to state a cause of action for either claim. *Hodge*, 384 F.3d at 244 (to establish an FMLA interference claim, plaintiff must be an "eligible employee" under the FMLA); *Hummeny v. Genex Corp.*, 390 F.3d 901, 905 (6th Cir. 2004) ("This Court finds that the FMLA's 'eligible employee' requirement applies in all FMLA cases, including retaliation cases."). Where a plaintiff does not qualify as an "eligible employee", the Court lacks jurisdiction to decide the FMLA case. *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 607 (6th Cir. 1998).

Plaintiff does not dispute she fails to meet FMLA eligibility requirements. Rather, she primarily argues she was an "eligible employee" because EOPA "admitted and believed at the time [] Plaintiff was an 'eligible employee' and [EOPA's] policies regarding FMLA were inconsistent." (Doc. 22, at 10). Specifically, Plaintiff claims EOPA allowed other employees who did not qualify as eligible employees to receive FMLA benefits while denying those same benefits to Plaintiff. Even assuming this conduct occurred, it does not change Plaintiff's eligibility status under the FMLA.

In *Connors v. SpectraSite Commc'ns, Inc.*, 465 F.Supp. 2d 834, 851-52 (S.D. Ohio 2006), the court rejected plaintiff's argument that he was an eligible employee because his employer "admitted" he was an eligible employee, had previously granted him leave under the FMLA, and granted leave to others who reported to offices with less that 50 employees.  Further, in *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 605 (6th Cir. 1998), the court refused to expand the scope of the FMLA where the employer did not have the requisite number of employees, even when

the employer explicitly adopted FMLA policies as its own.[2] While Plaintiff's ineligibility arises from a different statutory requirement, the same principle applies. Congress specifically limited coverage under the FMLA to those employed for at least twelve months, performing at least 1,250 hours of service. 29 U.S.C. §2611(A). In this case, the plain language of the FMLA excludes Plaintiff from coverage under the Act. Plaintiff readily admits she knew she did not qualify for coverage, and the fact that EOPA might have approved FMLA benefits for other unqualified employees still does not bring her within the ambit of the Act. Accordingly, Plaintiff's FMLA claims fail.

### Pregnancy and Gender Discrimination

Plaintiff alleges pregnancy discrimination under both federal and state law – specifically, Title VII, as amended by the Pregnancy Discrimination Act,  and Ohio Rev. Code § 4112. It is well accepted the standards for these claims under federal and state law are identical. *Genaro v. Cent. Transp., Inc*. 84 Ohio St.3d 293, 296-98 (1999). Ohio Rev. Code § 4112.02(A) prohibits employers from discharging without just cause any person because of the employee's sex. The term "because of the . . . sex of any person" means "because of or on the basis of pregnancy, any illness arising out of or occurring during the course of pregnancy, childbirth, or related medical conditions." *Id*. § 4112.02(B); *see Woodworth v. Concord Mgmt. Ltd.*, 164 F. Supp.2d 978, 982 (S.D. Ohio 2000).

To establish a pregnancy discrimination claim, a plaintiff may employ one of two methods: the direct case, or the circumstantial indirect case.  *Woodworth*, 164 F. Supp.2d at 982. Plaintiff asserts Ms. Anderson's derogatory statement about pregnancy constitutes direct evidence of

---

2. While *Douglas* was overruled in part by *Cobb v. Contract Trans., Inc.*, 452 F.3d 543, 549 (6th Cir. 2006), the "Sixth Circuit gave no indication in *Cobb* that it was overruling the portion of its holding in *Douglas* finding that an employer or employee could not expand the scope of the FMLA." *Connors*, 465 F. Supp.2d at 852.

10

discrimination. Regardless, Plaintiff argues she can establish a circumstantial case using the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Direct Case

"Direct evidence is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least the motivating factor in the employer's actions.'" *Davidson v. Franciscan Health Sys. of the Ohio Valley, Inc.* 82 F. Supp.2d 768, 771 (S.D. Ohio 2000) (quoting *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). If the plaintiff establishes such direct evidence, the burden shifts to the employer to show it would have taken the adverse employment action even if it had not been motivated by discrimination. *Jacklyn*, 176 F.3d at 926 (quotations omitted).

Discriminatory comments by an employer may constitute direct evidence of discrimination in the proper context. *McIntosh v. Stanley Bostitch, Inc.* 82 F. Supp.2d 775, 783 (S.D. Ohio 2000). "The Sixth Circuit has noted that direct evidence, in the form of verbal comments, will be along the lines of an employer stating that 'I fired you because you are disabled.'" *Id.* (quoting *Kvintus v. R.L. Polk & Co.*, 3 F. Supp.2d 788, 793 (6th Cir. 1999). In analyzing discriminatory comments, factors to consider include: 1) whether a decision maker or an agent made the comment; 2) whether the comment was related to the decision making process; and 3) whether the comment and discriminatory act were close in time. *McIntosh*, 82 F. Supp.2d at 783 (quotations omitted); *see Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994).

Plaintiff claims Ms. Anderson "reprimanded" her for being pregnant – specifically, that Ms. Anderson indicated another employee was also pregnant and expressed concern it would be unfair for other staff members to have to cover for two maternity leaves. (Doc. 19-3, at 53). Even accepting

11

this statement as true, Plaintiff has failed to show this comment was related to her termination. According to Plaintiff, EOPA human resources personnel held disciplinary meetings to discuss her medical leave exhaustion. (Doc. 19-3, at 75-77). Ms. Anderson did not attend or participate in any of these meetings. Moreover, Plaintiff testified these meetings only involved discussions related to medical leave and took place months after the comment was alleged to have been made. (Doc. 19-3, at 75-77). Subsequently, Plaintiff filed a grievance through her union contesting her termination, and a hearing was held on that issue. (Doc. 19-3, at 79-81). At this hearing, Plaintiff, through her OAPSE representative, asserted she was wrongfully terminated because she was not given written notice about the leave policy and EOPA continued to accept Plaintiff's insurance payments, effectively extending her leave. (Doc. 19-3, at 81). Once again, Ms. Anderson was not at this hearing. (Doc. 19-3, at 82). There is no evidence Ms. Anderson's alleged animus was mentioned by Plaintiff or Plaintiff's union representatives at any time during the termination or grievance process. Rather, Plaintiff consistently alleged she thought she was entitled to the full leave she requested under the "leave without pay" policy and was wrongfully terminated because she was not notified otherwise.

Plaintiff argues Ms. Anderson's admitted power to hire and fire supports the notion that she was meaningfully involved in the termination decision, relying on a portion of *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) which states "discriminatory statements need not have been made by the ultimate decision maker in order to prove discriminatory intent." Even accepting this as true, Plaintiff must offer some evidence to show the alleged derogatory remarks had some effect on the decision making process. *McIntosh*, 82 F. Supp.2d at 783. As noted above, Plaintiff has not done so. "It is well established that isolated and ambiguous comments are not sufficient to make out a direct evidence case of employment discrimination." *Weigel v. Baptist Hosp.*

12

*of Eat. Tenn.*, 302 F.3d 376, 382 (6th Cir. 2002). Accordingly, Plaintiff has failed to prove direct evidence of discrimination.

<u>Indirect Case</u>

Alternatively, Plaintiff argues she can establish a circumstantial case of discrimination, employing the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (citing *Mauzy v. Kelly Servs., Inc.*, 76 Ohio St.3d 578, 582 (1996). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. To set forth prima facie case of discrimination under § 4112.02, Plaintiff must establish that: (1) she was pregnant; (2) she was discharged; and (3) a non-pregnant employee, similar in ability or inability to work, was treated differently. *McConaughy v. Boswell Oil, Co.*, 711 N.E.2d 719, 725 (Ohio App. Ct. 1998). Once these elements are established, the burden shifts to the employer to articulate a nondiscriminatory reason for the discharge. *Id.*; *McDonnell Douglas*, 411 U.S. 792. If the employer does so, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's proffered reasons are pretextual. *McConaughy*, 711 N.E.2d at 725 (quotations omitted); *see also Frantz v. Beechmont Pet Hosp.*, 690 N.E.2d 897 (Ohio App. Ct. 1996).

Plaintiff alleges "other employees who were not pregnant but otherwise similarly situated were not terminated [when they exhausted their leave]." (Doc. 22, at 14). However, Plaintiff has failed to support this assertion, even when the Court granted her leave to do so.[3] (Doc. 26). Instead,

---

3. "The absence of additional evidence to support a party's position beyond his own self-serving testimony is insufficient to overcome a motion for summary judgment." *Britenriker v. Mock*, 2009 WL 2392917 at FN1 (N.D.Ohio 2009), *citing Bryant v. Mahoning County Bd. of Comm'rs*, 2007 WL 1725314, at *7 (N.D.Ohio 2007); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1994).

there is evidence contrary to Plaintiff's assertion – namely, Ms. Key's testimony that a non-pregnant employee, Mr. Winters, was also fired for exhausting his medical leave. (Doc. 19-3, at 42-43). Accordingly, Plaintiff has failed to establish a case for gender or pregnancy discrimination with either direct or circumstantial evidence.

### Public Policy Claim

In Count Eight of her Amended Complaint, Plaintiff raises a tort claim for violation of public policy. (Doc. 15, at 9,11). Plaintiff argues Ohio has a "clear public policy proscribing gender discrimination" and if Defendants' actions are allowed to go unredressed, "this public policy would be placed in jeopardy." (Doc. 15, at 11). In order to prevail on this claim, Plaintiff must prove the following four elements:

1. The *clarity* element: a clear public policy exists and is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law.

2. The *jeopardy* element: dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize public policy.

3. The *causation* element: the dismissal was motivated by conduct related to public policy.

4. The *overriding justification* element: the employer lacked overriding legitimate business justification for the dismissal.

*Pizzimenti v. Oldcastle Glass Inc.*, 666 F. Supp.2d 839, 848-49 (N.D. Ohio 2009).

Ohio law does not support Plaintiff's claim because the public policy at issue is already supported by an available and adequate remedy found in Ohio Rev. Code §4112. Therefore, the jeopardy element cannot be met. *Id.*; *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 531-32 (Ohio 2002); *Leininger v. Pioneer Nat'l Latex*, 115 Ohio St.3d 311, 317 (2007) ("[I]t is unnecessary to recognize a common-law claim when remedy provisions are an essential part of the statutes upon

14

which plaintiff depends for the public policy claim and when those remedies adequately protect society's interest by discouraging wrongful conduct.").

Plaintiff argues the decision in *Wiles* was limited to the FMLA and not a public policy violation based on discrimination. Plaintiff further relies on *Butka v. J.C. Penney*, 359 F. Supp.2d 649 (N.D. Ohio 2004) to assert that public policy claims pursuant to § 4112 are viable because the Ohio Supreme Court has never ruled §4112 provides an adequate remedy under the statute. However, this notion was rejected in *Kleinmark v. CHS-Lake Erie, Inc*. 2008 WL 2740817, at *6 (N.D. Ohio 2008) (*Butka* has been overruled with respect to § 4112.02 public policy claims); *see also Carrasco v. NOAMTC Inc.*, 124 Fed. Appx. 297, 304 (6th Cir. 2004). Plaintiff is correct that the Ohio Supreme Court has never explicitly ruled whether §4112 provides remedies broad enough to compensate an employee for an employer's violation of the statute. Even so, based on the reasoning in *Wiles* coupled with remedies available in §4112, Plaintiff's claim fails.

Regarding the jeopardy element, the Ohio Supreme Court in *Wiles* stated there must be no other recourse or remedy available concerning public policy torts:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim. . . .Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis. . . . Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Wiles*,  773 N.E.2d at 531 (emphasis added); *see also Carrasco*, 124 Fed. Appx. at 304.

Plaintiff argues §4112 does "not necessarily provide adequate remedies to fully compensate an employee", arguing only compensatory damages are available, rather than punitive. The Court disagrees. As noted above, the Ohio Supreme Court is concerned about providing remedies that

15

adequately protect society's interest, and §4112.99 does this by allowing the full range of remedies in civil actions alleging violations of § 4112.02. *See Rice v. CertainTeed Corp.*, 704 N.E.2d 1217 (Ohio 1999); Ohio Rev. Code §4112.99. Because an adequate remedy that protects society's interest is available in § 4112, Plaintiff's public policy claim fails.

### *Intentional Infliction of Emotional Distress*

In Count Nine of her Amended Complaint, Plaintiff alleges Defendants inflicted severe emotional distress upon her. To establish a claim for intentional infliction of emotional distress, a plaintiff must prove the defendant's conduct was "so extreme and outrageous" as to go "beyond all possible bounds of decency" and was such that it can be considered "utterly intolerable in a civilized community." *Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983). Here, Plaintiff fails both the "outrageousness" and "severe mental anguish" elements.

The "outrageousness" determination is a question of law for the court to decide. *Crawford v. IT Consumer Fin. Corp.*, 653 F.Supp. 1184, 1192 (S.D. Ohio 1986). Other courts have found that conduct far more extreme than the alleged conduct here did not meet the "outrageous" standard. For example, in *Boggs v. Avon Prods., Inc.* 564 N.E.2d 1128 (Ohio 1990), allegations that a plaintiff's supervisor continually harassed and threatened him, knowing such conduct would cause him anxiety, did not rise to the level of "outrageous" conduct. Here, the conduct alleged – an isolated comment about the unfairness to other employees covering maternity leave – does not rise to the level of outrageous conduct defined above. Accordingly, Plaintiff's allegations of improper conduct fall short of the extreme and outrageous conduct necessary for the tort of intentional infliction of emotional distress. *See, e.g., Pizzimenti*, 666 F.Supp.2d at 848.

Additionally, Plaintiff fails to meet the severe mental anguish element which requires mental

16

anguish "of a nature that 'no reasonable man could be expected to bear it.'" *Ashcroft v. Mount Sinai Medical Center*, 588 N.E.2d 280, 284 (Ohio 1990). Plaintiff does not point to such anguish anywhere in her opposition, and the Court can find nothing in the record to indicate mental anguish other than Plaintiff's conclusory statement in her Amended Complaint. Even assuming Plaintiff suffered from mental anguish, a conclusory statement, with nothing more, cannot defeat a summary judgment motion. *See supra* note 2. Simply put, Plaintiff has failed to set forth any evidence to support her claim. Fed. R. Civ. P. 56.

### *Loss of Consortium*

As a result of Plaintiff's alleged emotional distress, Plaintiff's husband claims he has experienced loss of consortium. (Doc. 15, at 11-12). A loss-of-consortium claim consists of three elements: "1) that the defendant negligently or intentionally caused the injuries of the plaintiff's spouse; 2) that the plaintiff has suffered a loss of consortium and 3) [that] the injuries of [the] plaintiff's spouse have caused the loss of consortium". *Brockmeyer v. Mansfield Gen. Hosp.*, 1987 WL 7154, at *3 (Ohio App. 1987).

A claim for loss of consortium is a derivative claim in that it is wholly dependant upon the defendant having committed a legally cognizable tort upon the spouse who suffers bodily injury. *Blatnick v. Dennison*, 148 Ohio App.3d 494, 513 (2002). Thus, an action for loss of consortium must be based on physical injury to the plaintiff's spouse. *Francis v. Gaylord Container Corp.*, 837 F.Supp. 858, 864 (S.D. Ohio 1992). It is well accepted by Ohio courts that "bodily injury" does not include non-physical harms such as emotional distress. *Morgan v. Enterprise Rent-A-Car*, 2000 WL 523085 (Ohio Ct. App. 2000); *Bowman v. Holcomb*, 614 N.E.2d 838 (1992).

17

**CONCLUSION**

Because no genuine issues of material fact exist on any of Plaintiff's claims, the Court grants

Defendant's Motion for Summary Judgment. The case is dismissed.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge

18